NATIONAL FEDERATION OF FEDERAL EMPLOYEES,
LOCAL 1309 *v.* DEPARTMENT OF THE INTERIOR
ET AL.

No. 97–1184.   Argued November 9, 1998—Decided March 3, 1999*

---

*Together with No. 97–1243, *Federal Labor Relations Authority* v.
*Department of the Interior et al.*, also on certiorari to the same court.

BREYER, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, and in which SCALIA and THOMAS, JJ., joined as to Part I, *post*, p. 101.

*Gregory O'Duden* argued the cause for petitioner in No. 97–1184. With him on the briefs was *Barbara A. Atkin. David M. Smith* argued the cause for petitioner in No. 97–1243. With him on the brief was *James F. Blandford.*

*Irving L. Gornstein* argued the cause for the Department of the Interior in both cases. On the brief were *Solicitor General Waxman, Assistant Attorney General Hunger, Deputy Solicitor General Underwood, Jonathan E. Nuechterlein, William Kanter, Robert M. Loeb,* and *Sushma Soni.*†

---

†*Jonathan P. Hiatt, James B. Coppess, Marsha S. Berzon, Laurence Gold, Mark D. Roth,* and *Kevin M. Grile* filed a brief for the American Federation of Labor and Congress of Industrial Organizations et al. as *amici curiae* urging reversal.

JUSTICE BREYER delivered the opinion of the Court.

The Federal Service Labor-Management Relations Statute requires federal agencies and the unions that represent their employees to "meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement." 5 U. S. C. § 7114(a)(4). We here consider whether that duty to bargain extends to a clause proposed by a union that would bind the parties to bargain midterm—that is, while the basic comprehensive labor contract is in effect—about subjects not included in that basic contract. We vacate a lower court holding that the statutory duty to bargain does not encompass midterm bargaining (or bargaining about midterm bargaining). We conclude that the Statute delegates to the Federal Labor Relations Authority the legal power to determine whether the parties must engage in midterm bargaining (or bargaining about that matter). We remand these cases so that the Authority may exercise that power.

I

Congress enacted the Federal Service Labor-Management Relations Statute (Statute or FSLMRS) in 1978. See 5 U. S. C. § 7101 *et seq.* Declaring that "labor organizations and collective bargaining in the civil service are in the public interest," § 7101(a), the Statute grants federal agency employees the right to organize, provides for collective bargaining, and defines various unfair labor practices. See §§ 7114(a)(1), 7116. It creates the Federal Labor Relations Authority, which it makes responsible for implementing the Statute through the exercise of broad adjudicatory, policymaking, and rulemaking powers. §§ 7104, 7105. And it establishes within the Authority a Federal Service Impasses Panel, to which it grants the power to resolve negotiation impasses through compulsory arbitration, § 7119, hence without the strikes that the law forbids to federal employees, § 7116(b)(7).

Of particular relevance here, the Statute requires a federal agency employer to "meet" with the employees' collective-bargaining representative and to "negotiate in good faith for the purposes of arriving at a collective bargaining agreement." § 7114(a)(4). The Courts of Appeals disagree about whether, or the extent to which, this good-faith-bargaining requirement extends to midterm bargaining. Suppose, for example, that the federal agency and the union negotiate a basic 5-year contract. In the third year a matter arises that the contract does not address. If the union seeks negotiations about the matter, does the Statute require the agency to bargain then and there, or can the agency wait for basic contract renewal negotiations? Does it matter whether the basic contract itself contains a "zipper clause" expressly forbidding such bargaining? Does it matter whether the basic contract itself contains a clause expressly permitting midterm bargaining? Can the parties insist upon bargaining endterm (that is, during the negotiations over adopting or renewing a basic labor contract) about whether to include one or the other such clauses in the basic contract itself?

In 1985 the Authority began to answer some of these questions. It considered a union's effort to force midterm negotiations about a matter the basic labor contract did not address, and it held that the Statute *did not* require the agency to bargain. *Internal Revenue Service,* 17 F. L. R. A. 731 (1985) *(IRS I).*

The Court of Appeals for the District of Columbia Circuit, however, set aside the Authority's ruling. The court held that in light of the intent and purpose of the Statute, it must be read to require midterm bargaining, inasmuch as it did not create any distinction between bargaining at the end of a labor contract's term and bargaining during that term. *National Treasury Employees Union* v. *FLRA,* 810 F. 2d 295 (1987) *(NTEU).* On remand the Authority reversed its earlier position. *Internal Revenue Service,* 29 F. L. R. A.

162, 166 (1987) *(IRS II)*.   Accepting the D. C. Circuit's analysis, the Authority held:

"[T]he duty to bargain in good faith imposed by the Statute requires an agency to bargain during the term of a collective bargaining agreement on negotiable union-initiated proposals concerning matters which are not addressed in the [basic] agreement and were not clearly and unmistakably waived by the union during negotiation of the agreement." *Id.*, at 167.

The Fourth Circuit has taken a different view of the matter.   It has held that "union-initiated midterm bargaining is not required by the statute and would undermine the congressional policies underlying the statute." *Social Security Administration* v. *FLRA*, 956 F. 2d 1280, 1281 (1992) *(SSA)*. Nor, in its view, may the basic labor contract itself impose a midterm bargaining duty upon the parties. *Department of Energy* v. *FLRA*, 106 F. 3d 1158, 1163 (1997) (holding unlawful a midterm bargaining clause that the Federal Service Impasses Panel had imposed upon the parties' basic labor contract).

In the present suit, the National Federation of Federal Employees, Local 1309 (Union), representing employees of the United States Geological Survey, a subagency of the Department of the Interior (Agency), proposed including in the basic labor contract a midterm bargaining provision that said:

"The Union may request and the Employer will be obliged to negotiate [midterm] on any negotiable matters not covered by the provisions of this [basic] agreement." *Department of Interior*, 52 F. L. R. A. 475, 476 (1996).

The Agency, relying on the Fourth Circuit's view that the Statute prohibits such a provision, refused to accept, or to bargain about, the proposed clause.   The Authority, reiterating its own (and the D. C. Circuit's) contrary view, held that the Agency's refusal to bargain amounted to an unfair labor practice. *Id.*, at 479–481.   The Statute itself, said the Au-

thority, imposes an obligation to engage in midterm bargaining—an obligation that the proposed clause only reiterates. *Id.*, at 479–480. And even if such an obligation did not exist under the Statute, the Authority added, a proposal to create a *contractual* obligation to bargain midterm is a fit subject for endterm negotiation. *Id.*, at 480–481. Consequently, the Authority ordered the Agency to bargain over the proposed clause.

The Fourth Circuit set aside the Authority's order. 132 F. 3d 157 (1997). The court reiterated its own view that the Statute itself does not impose any midterm bargaining duty. *Id.*, at 161–162. That being so, it concluded, the parties should not be required to bargain endterm about including a clause that would require bargaining midterm. The court reasoned that once bargaining over such a clause began, the employer would have no choice but to accept the clause. Were the employer not to do so (by bargaining to impasse over the proposed clause), the Federal Service Impasses Panel would then inevitably insert the clause over the employer's objection, as the Impasses Panel (like the D. C. Circuit) believes that a midterm bargaining clause would merely reiterate the duty to bargain midterm that the Statute itself imposes. *Ibid.*

We granted certiorari to consider the conflicting views of the Circuits.

## II

We shall focus primarily upon the basic question that divided the Circuits: Does the Statute itself impose a duty to bargain during the term of an existing labor contract? The Fourth Circuit thought that the Statute did not impose a duty to bargain midterm and that the matter was sufficiently clear to warrant judicial rejection of the contrary view of the agency charged with the Statute's administration. *SSA, supra*, at 1284 (stating that " 'Congress has directly spoken to the precise question at issue,' " and quoting *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*,

467 U. S. 837, 842 (1984)). We do not agree with the Fourth Circuit, for we find the Statute's language sufficiently ambiguous or open on the point as to require judicial deference to reasonable interpretation or elaboration by the agency charged with its execution. See *id.*, at 842–845; *Fort Stewart Schools* v. *FLRA*, 495 U. S. 641, 644–645 (1990).

The D. C. Circuit, the Fourth Circuit, and the Authority all agree that the Statute itself does not expressly address union-initiated midterm bargaining. See *NTEU, supra,* at 298; *SSA, supra,* at 1284; Brief for Petitioner FLRA in No. 97–1243, p. 18. The Statute's relevant language simply says that federal agency employer and union representative "shall meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement." 5 U. S. C. § 7114(a)(4). It defines the key term "collective bargaining agreement" as an "agreement entered into as a result of collective bargaining." § 7103(a)(8). And it goes on to define "collective bargaining" as involving the meeting of employer and employee representatives "at reasonable times" to "consult" and to "bargain in a good-faith effort to reach agreement with respect to the conditions of employment," incorporating "any collective bargaining agreement reached" as a result of these negotiations in "a written document." § 7103(a)(12). This language, taken literally, may or may not include a duty to bargain collectively midterm.

The Agency, here represented by the Solicitor General, argues that in context, this language *must* exclude midterm bargaining. We shall explain why we do not agree with each of the Agency's basic arguments.

First, the Agency makes a variety of linguistic arguments. As an initial matter, it emphasizes the words "arriving at" in the Statute's general statement that the parties must bargain "for the purposes of *arriving at* a collective bargaining agreement." This statement tends to exclude midterm bargaining, the Agency contends, because parties engage in midterm bargaining, not for the purpose of *arriving at,* but

for the purpose of *supplementing*, their basic, comprehensive labor contract. In other words, the basic collective-bargaining agreement is the only appropriate destination at which negotiations might "arriv[e]." The Agency adds that "collective bargaining agreement" is a term of art, which only and always refers to basic labor contracts, not to midterm agreements.

Further, while the Agency acknowledges that there is a duty to bargain midterm in the private sector, see *NLRB* v. *Jacobs Manufacturing Co.*, 196 F. 2d 680 (CA2 1952), it argues that this private-sector duty is based upon language in the National Labor Relations Act (NLRA) that is different in significant respects from the language in the Statute here. The Agency explains that the NLRA defines private-sector collective bargaining to include (1) negotiation "with respect to wages, hours, and other terms and conditions of employment, *or* [(2)] the negotiation of an agreement, or any question arising thereunder." 29 U. S. C. § 158(d) (emphasis added). The "or," under this view, indicates that private-sector employers have a comprehensive duty to "bargain collectively" whether or not such bargaining is part of "the negotiation of an agreement" leading to "written contract."

In our view, these linguistic arguments, while logical, make too much of too little. One can easily read "arriving at *a collective bargaining agreement*" as including an agreement reached at the conclusion of midterm bargaining, particularly because the Statute itself does no more than define the relevant term "collective bargaining agreement" in a circular way—as "an agreement entered into as a result of collective bargaining." 5 U. S. C. § 7103(a)(8). Nor have we found any statute, judicial opinion, agency document, or treatise that says whether the words "collective bargaining agreement" are words of art that must necessarily exclude midterm agreements. Finally, the linguistic differences between the NLRA and the FSLMRS tell us little, particularly given the fact that the two labor statutes, like collective bar-

gaining itself, are not otherwise identical in the two sectors. For all these reasons, we find in the relevant statutory language ambiguity, not certainty.

Second, the Agency—like the Fourth Circuit—contends that the Statute's policies demand a reading of the statutory language that would exclude midterm bargaining from its definition of "collective bargaining." The availability of midterm bargaining, the Agency argues, might lead unions to withhold certain subjects from ordinary endterm negotiations and then to raise them during the term, under more favorable bargaining conditions. A union might conclude, for example, that it is more likely to get what it wants by presenting a proposal during the term (when no other issues are on the table and a compromise is less likely) and then negotiating to impasse, thus leaving the matter for the Federal Service Impasses Panel to resolve. The Agency also points out that public-sector and private-sector bargaining differ in this respect. Private-sector unions enforce their views through strikes, and because they hesitate to strike midterm, they also have no particular incentive to bargain midterm. But public-sector unions enforce their views through compulsory arbitration, not strikes. Hence, the argument goes, public-sector unions have a unique incentive to bargain midterm on a piecemeal basis, thereby threatening to undermine the basic collective-bargaining process. See, e. g., SSA, 956 F. 2d, at 1288–1289.

Other policy concerns, however, argue for a different reading of the Statute. Without midterm bargaining, for example, will it prove possible to find a collective solution to a workplace problem, say, a health or safety hazard, that first appeared midterm? The Statute's emphasis upon collective bargaining as "contribut[ing] to the effective conduct of public business," 5 U. S. C. §7101(a)(1)(B), suggests that it would favor joint, not unilateral, solutions to such midterm problems.

The Authority would seem better suited than a court to make the workplace-related empirical judgments that would help properly balance these, and other, policy-related considerations. The Statute does not indicate that Congress itself decided to make these specific policy judgments. Hence the Agency's policy arguments illustrate the need for the Authority's elaboration or refinement of the basic statutory collective-bargaining obligation; they illustrate the appropriateness of judicial deference to considered Authority views on the matter; and, most importantly, they do not narrow the scope of a statutory provision the language of which is consistent with a variety of interpretations.

Third, the Agency argues that the Statute's history and prior administrative practice support its view that federal agencies have no duty to bargain midterm. The Statute grew out of an Executive Order that previously had governed federal-sector labor relations. See Exec. Order No. 11491, 3 CFR 861 (1966–1970 Comp.), as amended by Exec. Order Nos. 11616, 11636, and 11838, 3 CFR 605, 634, 957 (1971–1975 Comp.). In support, the Agency cites a case in which an Assistant Secretary of Labor, applying that Executive Order, dismissed an unfair labor practice complaint on the ground, among others, that a federal agency need not bargain over midterm union proposals. *Army and Air Force Exchange Serv., Capital Exchange Region Headquarters,* Case No. 22–6657(CA), 2 Rulings on Requests for Review of Assistant Secretary of Labor for Labor-Management Relations 561–562 (1976) (not reviewed by the Federal Labor Relations Council, predecessor to the Authority); see *IRS I,* 17 F. L. R. A., at 736–737, n. 7 (finding, based upon this decision, that there was no obligation to bargain over midterm union proposals under the Executive Order). A single alternative ground, however—in a single, unreviewed decision from before the Statute was enacted—does not demonstrate the kind of historical practice that one might assume would

be reflected in the Statute, particularly when at least one treatise suggested at the time that federal labor relations practice was to the contrary. See H. Robinson, Negotiability in the Federal Sector 10–11, and n. 9 (1981) (stating that under the Executive Order both unions and agencies had a continuing duty to bargain through the term of a basic labor contract).

The Agency also points to a Senate Report in support of its interpretation of the Statute. That Report speaks of the parties' "mutual duty to bargain" with respect to (1) "changes in established personnel policies proposed by management," and (2) "negotiable proposals initiated by either the agency or [the union] . . . in the context of negotiations *leading to a basic collective bargaining agreement.*" S. Rep. No. 95–969, p. 104 (1978) (emphasis added). This Report, however, concerns a bill that contains language similar to the language before us but was not enacted into law. According to the D. C. Circuit, at least, any distinction between basic and midterm bargaining that is indicated by this passage "did not survive the rejection by Congress of the Senate's restrictive view of the rights of labor and the importance of collective bargaining." *NTEU*, 810 F. 2d, at 298. In any event, the Report's list of possible occasions for collective bargaining does not purport to be an exclusive list; it does not say that the Statute was understood to exclude midterm bargaining; and any such implication is simply too distant to control our reading of the Statute.

Fourth, the Agency and the Fourth Circuit contend that the "management rights" provision of the Statute, 5 U. S. C § 7106, *does* authorize limited midterm bargaining in respect to certain matters (not here at issue), and that by negative implication it denies permission to bargain midterm in respect to any others. See, *e. g., SSA, supra,* at 1284 ("The inclusion of a specific duty of midterm effects bargaining . . . suggests the inadvisability of reading a more general duty into the statute"). Our examination of that provision

however, finds little support for such a strong negative implication.

Subsection (a) of the management rights provision withdraws from collective bargaining certain subjects that it reserves exclusively for decision by management. It specifies, for example, that federal agency "management official[s]" will retain their authority to hire, fire, promote, and assign work, and also to determine the agency's "mission, budget, organization, number of employees, and internal security practices." § 7106(a).

Subsection (b), however, permits a certain amount of collective bargaining in respect to the very subjects that subsection (a) withdrew. Subsection (b) states:

> "*Nothing in this section shall preclude* any agency and any labor organization from negotiating—
>
> "(1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;
>
> "(2) procedures which management officials . . . will observe in exercising any authority under this section; or
>
> "(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials." § 7106(b) (emphasis added).

The two subsections of the management rights provision, taken together, do not help the Agency. While the provision contemplates that bargaining over the impact and implementation of management changes may take place during the term of the basic labor contract, subsection (b) need not be read to actually impose a duty to bargain midterm. The italicized clause, "[n]othing in this section shall preclude," indicates only that the delegation of certain rights to man-

agement (*e. g.*, promotions) shall not *preclude* negotiations about certain related matters (*e. g.*, promotion procedures). By its terms, then, subsection (b) does nothing more than create an exception to subsection (a), preserving the duty to bargain with respect to certain matters otherwise committed to the discretion of management. Because § 7106(b) chiefly addresses the subject matter of bargaining and not the timing, one could reasonably conclude that while that subsection contemplates midterm bargaining in the circumstances there specified, the duty to bargain midterm finds its source elsewhere in the Statute. Hence, the management rights provision seems to hurt, as much as to help, the Agency's basic argument.

The upshot of this analysis is that where the Agency and the Fourth Circuit find a clear statutory denial of any midterm bargaining obligation, we find ambiguity created by the Statute's use of general language that might, or might not, encompass various forms of midterm bargaining. That kind of statutory ambiguity is inconsistent both with the Fourth Circuit's absolute reading of the Statute and also with the D. C. Circuit's similarly absolute, but opposite, reading. Compare *SSA*, 956 F. 2d, at 1284, with *NTEU*, 810 F. 2d, at 301 (rejecting the Authority's position that there is no duty to bargain midterm on the ground that it is "contrary to the intent of the legislature and the guiding purpose of the statute"). Indeed, the D. C. Circuit's analysis implicitly concedes the need to make at least *some* midterm bargaining distinctions, when it assumes that the midterm bargaining obligation does not extend to matters that are covered by the basic contract. See *id.*, at 296.

The statutory ambiguity is perfectly consistent, however, with the conclusion that Congress delegated to the Authority the power to determine—within appropriate legal bounds, see, *e. g.*, 5 U. S. C. § 706 (Administrative Procedure Act); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council,*

*Inc.*, 467 U. S. 837 (1984)—whether, when, where, and what sort of midterm bargaining is required. The Statute's delegation of rulemaking, adjudicatory, and policymaking powers to the Authority supports this conclusion. See 5 U. S. C. § 7105(a)(1) ("Authority shall provide leadership in establishing policies and guidance"); § 7105(a)(2)(E) (Authority "resolves issues relating to the duty to bargain in good faith"); § 7117(c) (Authority resolves disputes about whether the duty to bargain in good faith extends to a particular matter); accord, *American Federation of Govt. Employees, Local 2986, AFL–CIO v. FLRA*, 775 F. 2d 1022, 1027 (CA9 1985); *American Federation of Govt. Employees, AFL–CIO, Council of Soc. Sec. Dist. Office Locals, San Francisco Region v. FLRA*, 716 F. 2d 47, 50 (CADC 1983). This conclusion is also supported by precedent recognizing the similarity of the Authority's public-sector and the National Labor Relations Board's private-sector roles. As we have recognized, the Authority's function is "to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act," and it "is entitled to considerable deference when it exercises its 'special function of applying the general provisions of the Act to the complexities' of federal labor relations." *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U. S. 89, 97 (1983) (quoting *NLRB v. Erie Resistor Corp.*, 373 U. S. 221, 236 (1963)).

We conclude that Congress "left" the matters of whether, when, and where midterm bargaining is required "to be resolved by the agency charged with the administration of the statute in light of everyday realities." *Chevron, supra*, at 865–866.

### III

The specific question before us is whether an agency must bargain endterm about including in the basic labor contract a clause that would require certain forms of midterm bar-

gaining. As is true of midterm bargaining itself, and for similar reasons, the Statute grants the Authority leeway (within ordinary legal limits) in answering that question as well.

The Authority says that it has determined, as a matter of its own judgment, that the parties must bargain over such a provision. Our reading of its relevant administrative determinations, however, leads us to conclude that its judgment on the matter was occasioned by the D. C. Circuit's holding that the Statute must be read to impose on agencies a duty to bargain midterm. See, *e. g., Merit Systems Protection Bd. Professional Assn.*, 30 F. L. R. A. 852, 859–860 (1988) (midterm bargaining clause is negotiable because it "reiterates a right the Union has under the Statute"); 52 F. L. R. A., at 479 (in the instant suit, restating that same conclusion). The Authority did indicate below that even if it agreed with the Fourth Circuit's position that the Statute does not impose a duty to bargain midterm, the outcome in this litigation would be no different, as the Authority " 'has previously upheld the negotiability of proposals despite the absence of a statutory right concerning the matter in question.' " *Id.*, at 480 (quoting *Department of Energy*, 51 F. L. R. A. 124, 127 (1995), enf. denied, *Department of Energy* v. *FLRA*, 106 F. 3d 1158 (CA4 1997)). This explanation, however, seems more an effort to respond to, and to distinguish, a contrary judicial authority, rather than an independently reasoned effort to develop complex labor policies. Regardless, the Authority's conclusion would seem linked to the D. C. Circuit's basic understanding about the statutory requirements.

In light of our determination that the Statute does not resolve the question of midterm bargaining, nor the related question of bargaining about midterm bargaining, we believe the Authority should have the opportunity to consider these questions aware that the Statute permits, but does not compel, the conclusions it reached.

The judgment of the Fourth Circuit is vacated, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE joins, and with whom JUSTICE SCALIA and JUSTICE THOMAS join as to Part I, dissenting.

The Court today ignores the plain meaning of the Federal Service Labor-Management Relations Statute (Federal Labor Statute or Statute) and erroneously concludes that when an agency responds to a judicial decision by abandoning its own interpretation of a statute and adopting that of the judicial forum this Court should defer to the agency's revised position, rather than evaluate whether the revised interpretation renders, in fact, the most plausible reading of the statute. I respectfully dissent.

## I

The Federal Labor Statute plainly does not impose a general duty on agencies to bargain midterm. See *Social Security Administration* v. *FLRA,* 956 F. 2d 1280, 1281 (CA4 1992). Whether the language of a statute is plain or ambiguous is determined "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson* v. *Shell Oil Co.,* 519 U. S. 337, 341 (1997).

Here, the language of the Federal Labor Statute, as well as the specific and broader contexts in which that language is used, demonstrates that the Statute is unambiguous. The Federal Labor Statute specifies a few instances where midterm bargaining is required, see 5 U. S. C. § 7106(b), but it contains no provision that expressly or implicitly imposes a *general* duty on agencies to bargain during the term of a collective bargaining agreement. Rather, Congress defined

the general duty to bargain to include only a duty to "meet and negotiate in good faith for the purposes of *arriving at a collective bargaining agreement*," § 7114(a)(4) (emphasis added), and obligated agencies to negotiate "with a sincere resolve to reach *a collective bargaining agreement*," § 7114(b)(1) (emphasis added); see also § 7114(b)(5) (requiring parties "to take such steps as are necessary to implement such agreement"). The term "arrive" is commonly understood to mean "to reach a destination" or "to gain or achieve an end." See Webster's Third New International Dictionary 121 (1976). Thus, by its terms, the Federal Labor Statute requires an agency to "meet and negotiate in good faith" with unions only "for the purposes of" achieving an end: a comprehensive collective bargaining agreement. See also § 7103(a)(8) (defining "collective bargaining agreement" as "an agreement" reached through collective bargaining); § 7103(a)(12) (defining "collective bargaining," in part, as "to reach [an] agreement with respect to the conditions of employment").

The Court suggests that, because a midterm bargaining agreement is an end agreement of negotiation, the duty to bargain may encompass midterm agreements as well. See *ante*, at 93. As the word "midterm" suggests, however, such agreements are only a "midpoint" in the term of the underlying collective bargaining agreement. Because such agreements do not stand alone but relate back to the primary collective bargaining agreement, a midterm agreement is most appropriately regarded as a modification of, or a supplement to, the primary agreement reached pursuant to the Federal Labor Statute. See, *e. g.*, 29 U. S. C. § 158(d) (describing midterm bargaining agreements in private sector as "modification[s]" to the primary agreement). The Federal Labor Statute expresses no *general* duty on the part of agencies to negotiate modifications or supplements to an existing collective bargaining agreement. With respect to modifications and supplements, the Statute requires only that agen-

cies bargain over a few specified topics. See 5 U. S. C. § 7106(b).

Section 7106(b) *obligates* an agency to bargain midterm over specified agency initiatives, such as the creation of "procedures which management officials of the agency will observe in exercising any authority" under the Federal Labor Statute. § 7106(b)(2); see also § 7106(b)(3) (providing for bargaining over "appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials"); *American Federation of Government Employees, AFL-CIO, Local 2782* v. *FLRA*, 702 F. 2d 1183, 1186–1187 (CADC 1983). Because the Statute specifies a few, limited topics that are subject to midterm bargaining, it cannot be construed to require midterm bargaining generally. Such a construction, indeed, renders the specific and general obligations redundant. See, *e. g.*, *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 36 (1992).

The Court reasons that § 7106(b) does not define a limited duty to bargain midterm because it merely defines exceptions to § 7106(a), which, in turn, defines managerial rights that are themselves exceptions to the duties outlined in the Statute. Moreover, because the section's introductory language "indicates only that the delegation of certain rights to management . . . shall not *preclude* negotiations about certain related matters," see *ante*, at 97–98, the Court suggests that § 7106(b) defines a permissive exception to an exception rather than an obligation. It thus follows from the structure and text of § 7106(b) that "the duty to bargain midterm finds its source elsewhere in the Statute." *Ante*, at 98.

The Court's reliance on § 7106(b)'s introductory language is misplaced because the subparts of § 7106(b) indicate that this section defines an obligation, not a permissive exception. Specifically, although § 7106(b)(1) provides that an agency at its election can initiate bargaining on working conditions, §§ 7106(b)(2) and (b)(3) are mandatory, *requiring* that agen-

cies bargain midterm over the matters specified. At the very least, §§ 7106(b)(2) and (b)(3) demonstrate that Congress intended to impose only a limited duty on agencies to bargain midterm. Even assuming § 7106(b) is permissive, there is no basis for the Court's conclusion that this section demonstrates that a generalized duty to bargain midterm emanates from another statutory source; indeed, there is no other provision of the Statute from which such a duty could emanate. See *ante,* at 98. Accordingly, it is plain from its language and structure that a general duty to engage in midterm bargaining is not prescribed by the Federal Labor Statute.

That the Federal Labor Statute contemplates a single end agreement, and not supplementary agreements or modifications, is also demonstrated by a comparison of it to the National Labor Relations Act (NLRA), the Statute's private-sector counterpart. The duty to bargain, as defined in the NLRA, includes "the negotiation of an agreement, *or any question arising thereunder.*" 29 U. S. C. § 158(d) (emphasis added). This broad definition of the duty, which clearly contemplates negotiation of midterm agreements, stands in stark contrast to the duty defined in the Federal Labor Statute, to "arriv[e] at a collective bargaining agreement." 5 U. S. C. § 7114(a)(4). The NLRA also contains a proviso limiting this broad duty to negotiate when there is "in effect a collective-bargaining contract covering employees in an industry" and a party desires to "modify" that contract. 29 U. S. C. § 158(d). For example, there is no duty to engage in midterm bargaining over matters already "contained in" the existing collective bargaining agreement. *Ibid.* As noted above, the Federal Labor Statute lacks any comparable language. Because, at the time it drafted the Statute, Congress knew that the NLRA defined a duty to bargain midterm, see *NLRB* v. *Jacobs Mfg. Co.,* 196 F. 2d 680, 684 (CA2 1952), this omission indicates that Congress did not intend to include a similar duty in the Federal Labor Statute.

The Court concludes, nevertheless, that this omission is irrelevant because the Federal Labor Statute and the NLRA, as well as collective bargaining in the public and private sectors, are different. See *ante*, at 93; see also *Fort Stewart Schools* v. *FLRA*, 495 U. S. 641, 648 (1990) (observing that the Federal Labor Statute and the NLRA should not be read *in pari materia*). To be sure, there are differences between the Acts, but that fact does not render a comparison of them irrelevant. It is well established that "the interpretation of a doubtful statute may be influenced by language of other statutes which are not specifically related, but which apply to similar persons, things, or relationships." 2B N. Singer, Sutherland on Statutory Construction § 53.03, p. 233 (rev. 5th ed. 1992). Employing this principle, the Court has previously compared nonanalogous statutes to aid its interpretation of them. See *Overstreet* v. *North Shore Corp.*, 318 U. S. 125, 131–132 (1943) (using Federal Employers' Liability Act to aid interpretation of Fair Labor Standards Act of 1938 even though the two Acts were *not* strictly analogous). In light of these principles of construction, the NLRA may be used to aid our interpretation of the Federal Labor Statute. See also *Bureau of Alcohol, Tobacco and Firearms* v. *FLRA*, 464 U. S. 89, 92–93, 96–97 (1983) (analogizing the Federal Labor Relations Authority (FLRA) to the National Labor Relations Board).

A comparison of the two statutes explains why a duty to bargain midterm was included in the NLRA but omitted from the Federal Labor Statute. Under the Statute, but not the NLRA, the Government must subsidize union negotiators. See 5 U. S. C. § 7131(a). Consequently, there is little incentive for union negotiators to streamline their bargaining positions or to avoid extended midterm bargaining. Given this incentive structure, it is difficult to imagine that Congress would obligate Government agencies to bargain midterm, for such an obligation would likely cause perpetual collective bargaining. Continuous bargaining, however, is

contrary to the goal of the FLRA: to promote "effective and efficient" Government, not Government stymied by perpetual bargaining. §7101(b). Indeed, it was this realization that initially motivated the FLRA to reject the contention that the Federal Labor Statute contained a duty to bargain midterm. See *Internal Revenue Service*, 17 F. L. R. A. 731, 736–737 (1985) (observing that midterm bargaining would cause continuous bargaining on an issue-by-issue basis).

A duty to bargain midterm was also excluded from the Statute because, in the context of the no-strike regime of federal labor relations, it would leave the agency-employer at an unfair disadvantage. In the NLRA context, the union that wants to obtain a midterm modification or supplement from an employer who is dead set against it must pay the price of a strike that is costly to it and its members. In the context of the Federal Labor Statute, the union that wants to obtain a midterm modification or supplement need only bargain to an impasse and then hope that the Federal Service Impasses Panel will give it all (or at least some) of what it has requested. Demanding unreciprocated additional benefits is cost free. Thus, a midterm bargaining requirement might motivate a union to "hold [a] matter off until the term agreement is done[,] . . . initiate the proposal as part of a single-issue negotiation," and, if an impasse results, force the agency to arbitrate. Ferris, Union-Initiated Mid-Term Bargaining: A Catalyst in Reshaping Conflict Patterns, 5 Negotiation J. 407, 411–412 (Oct. 1989). Again, it is obvious that this incentive structure does not promote "effective and efficient" Government. §7101(b). Given the language and structure of the Federal Labor Statute, the context in which this language is used and the differences between the Statute and the NLRA, I would hold that the Federal Labor Statute plainly, and justifiably, does not impose a general duty to bargain midterm.

The FLRA argues, in the alternative, that even if the Federal Labor Statute does not impose a general obligation to

bargain midterm, agencies nevertheless must bargain over union-initiated proposals to include in term agreements midterm bargaining provisions. In other words, unions may propose that agency-employers agree to obligate themselves contractually to bargain midterm. In the private sector, the duty to bargain means only that the employer and the exclusive representative bargain over something in good faith. In the public sector, however, the duty to bargain over a proposal can have very different consequences: Unions may force an agency into binding arbitration by bargaining to impasse. § 7119(c)(5)(B)(iii). Therefore, by imposing a duty to bargain over midterm bargaining clauses, the FLRA is, at the very least, taking the choice of whether to bargain midterm out of a reluctant federal employer's hands, and placing it into the hands of the Federal Service Impasses Panel, a result that seems inconsistent with the Federal Labor Statute's goals of promoting "effective and efficient Government." § 7101(b).

There is, moreover, no statutory source for a duty to bargain over contractual requirements to bargain midterm. Section 7117(a)(1) directs an agency to bargain over "matters which are the subject of any rule or regulation only if the rule or regulation is not a Government-wide rule or regulation" but only "to the extent not inconsistent with any Federal law." The FLRA has interpreted this section to impose a duty on agencies to bargain over only proposals relating to conditions of employment. See Brief for Petitioner FLRA in No. 97–1243, p. 37. It is not apparent, however, how bargaining over a contractual requirement to bargain midterm is a "matte[r] . . . affecting working conditions." See 5 U. S. C. § 7103(a)(14) (defining "conditions of employment"). More important, because Congress, through the Federal Labor Statute, chose not to require agencies to bargain midterm, it is "inconsistent with . . . Federal law" for the FLRA to require bargaining over a contractual requirement to bar-

gain midterm. As I read the Statute, Congress has clearly rejected such a requirement.

## II

Even if I agreed with the Court that the Federal Labor Statute is ambiguous with respect to the duty to bargain midterm, I would not defer in this suit to the FLRA's interpretation of the Statute pursuant to *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–843 (1984).

We observed in *Good Samaritan Hospital* v. *Shalala,* 508 U. S. 402 (1993), that when an agency alters its interpretation of a statute, its revised interpretation may be entitled to less deference than a position consistently held. We explained:

> "The Secretary is not estopped from changing a view she believes to have been grounded upon a mistaken legal interpretation. Indeed, an administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue *de novo* and without regard to the administrative understanding of the statutes. On the other hand, the consistency of an agency's position is a factor in assessing the weight that position is due. As we have stated: 'An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view.' *INS* v. *Cardoza-Fonseca,* 480 U. S. 421, 446, n. 30 (1987). How much weight should be given to the agency's views in such a situation, and in particular where its shifts might have resulted from intervening and possibly erroneous judicial decisions and its current position from one of our own rulings, will depend on the facts of individual cases." *Id.,* at 417 (some citations and internal quotation marks omitted).

See also *INS* v. *Cardoza-Fonseca,* 480 U. S. 421, 446–447, and n. 30 (1987) (rejecting agency interpretation of statute on ground that interpretation was not consistent with congressional intent, and agency's interpretation was not entitled to heightened deference because it had been inconsistent over time); *Federal Election Comm'n* v. *Democratic Senatorial Campaign Comm.,* 454 U. S. 27, 37 (1981) (observing that the "thoroughness, validity, and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's ruling," but ultimately deferring to inconsistent agency position); see also *Watt* v. *Alaska,* 451 U. S. 259, 272–273 (1981) (holding that agency's interpretation of amendment that was contemporaneous with amendment's passage was entitled to considerably more deference than agency's current, inconsistent interpretation).

Here, the FLRA changed its position on the precise matter that we have been asked to consider—whether agencies have a duty to bargain midterm under the Federal Labor Statute—and did so in response to a judicial decision. Initially, the FLRA determined that the Statute did not impose a duty to bargain midterm, see *Internal Revenue Service,* 17 F. L. R. A. 731 (1985), but it came to the opposite conclusion after the D. C. Circuit rejected this reading of the Statute, see *National Treasury Employees Union* v. *FLRA,* 810 F. 2d 295 (1987) (holding the Statute required midterm bargaining); *Internal Revenue Service,* 29 F. L. R. A. 162, 166 (1987) (adopting D. C. Circuit's reading of the Statute). At the time it reversed course, the FLRA offered only a scant explanation for its sudden interpretive shift. It merely stated that it agreed with the D. C. Circuit's holdings and concluded, "based on the court's decision and in agreement with the Administrative Law Judge," that the IRS had impermissibly refused to bargain over a midterm proposal. *Id.,* at 165–166, 168. The only apparent reason for the agency's shift in interpretation was the D. C. Circuit's decision. In this circumstance, the agency's interpretation of

the Statute is entitled to less deference. See *Good Samaritan Hospital* v. *Shalala, supra,* at 417. This lesser standard of deference seems particularly appropriate here because we have recognized some limits on the FLRA's interpretive powers. See *Bureau of Alcohol, Tobacco and Firearms* v. *FLRA,* 464 U. S., at 108. Accordingly, we should endeavor to find the most plausible construction of the Federal Labor Statute and examine the Secretary's current interpretation in light of this construction.

The FLRA currently interprets the Federal Labor Statute to impose a duty on federal agencies to negotiate midterm those union-initiated proposals that are not covered in the term agreement unless the union has clearly waived its right to bargain midterm. See Brief for Petitioner FLRA in No. 97–1243, at 18–20; see *Department of Navy, Marine Corps Logistics Base* v. *FLRA,* 962 F. 2d 48, 56 (CADC 1992) (outlining FLRA position). This is not, however, the most plausible construction of the Statute. For the reasons previously discussed, there is no language in the Statute expressing a general duty to bargain midterm. Moreover, to the extent that the FLRA has codified exceptions to a generalized duty to bargain midterm, those exceptions are defined out of whole cloth; there is nothing in the text of the Federal Labor Statute that suggests limits on a duty to bargain midterm. For these reasons, even if there were some ambiguity in the Federal Labor Statute, I would hold that the agency's interpretation of the Federal Labor Statute is inferior to the natural, and most plausible, reading of that Statute—that there is no general duty to bargain midterm. See *Good Samaritan Hospital* v. *Shalala, supra,* at 417; *INS* v. *Cardoza-Fonseca, supra,* at 446–447, and n. 30. I respectfully dissent and would affirm the decision of the Fourth Circuit.