CARL E. STEWART, Circuit Judge,
concurring in part, dissenting in part:
While I agree with the majority’s disposition of plaintiffs disparate treatment *199 claim in Part IV of the opinion, I also believe that the district court erred in improvidently dismissing the plaintiffs disparate impact claim and, therefore, I must dissent with regard to Part III.
This marks the first time our court has had to squarely decide, in the aftermath of Hazen Paper v. Biggins, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), whether a disparate impact claim may be formulated under the ADEA. I, however, am not thoroughly convinced by the majority’s attempt to distinguish between two statutes — the ADEA and Title VII — whose text is virtually the same, that Congress meant to imply a disparate impact claim to the latter, but to preclude such a claim in the former. Equally, I am not persuaded by the majority’s emphasis on the “reasonable factors other than age” (“RFOA”) exception. When Congress enacted the ADEA in 1967, the courts had yet to develop a disparate impact theory. Thus, at the time of enactment, it appears that Congress most likely intended the RFOA to apply solely to claims of disparate treatment. Based upon a close reading of the text, the relevant legislative history, subsequent legislative actions, and concerns of public policy, I submit that a proper interpretation of the ADEA allows a disparate impact cause of action.
I. STATUTORY INTERPRETATION OF THE ADEA
The majority’s analysis begins with the premise that the RFOA exception of the ADEA facially appears as a safe harbor to employers. To the majority, the language of the RFOA exception clearly rejects the theory of disparate impact. The majority relies in part on a pre-Hazen dissent by Judge Easterbrook in Metz v. Transit Mix, Inc., for the proposition that the RFOA exception is “incomprehensible unless the prohibition forbids disparate treatment and the exception authorizes disparate impact.” 828 F.2d 1202, 1220 (7th Cir.1987) (emphasis added).
Contrary to the majority’s conclusion, it is not at all clear from the text that the RFOA exception has no alternative interpretation other than to preclude disparate impact. The RFOA exception aside, the language of the ADEA and Title VII are similar in every other respect. Thus, I cannot conclude, in the absence of expressed language to the contrary, that Congress meant to apply the disparate impact theory to Title VII, but not to the analogous language of the ADEA. Until the United States Supreme Court expressly rules on this issue, I continue to believe that the majority viewpoint is in error. Despite the obvious similarities between Title VII and the ADEA, today’s majority joins our fellow courts of the First,[1] Third,[2] Sixth,[3] Seventh,[4] Tenth,[5] and Eleventh[6] Circuits in disclaiming a disparate impact theory under the ADEA.
As shown through persuasive precedent from other circuits, however, there is another side to this debate. For example, while acknowledging that post-Hazen the availability of disparate impact claims un *200 der the ADEA is unsettled among the circuits, the Second Circuit held that it “generally assesses claims brought under the ADEA identically to those brought pursuant to Title VII, including disparate impact.” Smith v. Xerox, 196 F.3d 358, 367 n. 5 (2d Cir.1999). The Second Circuit is not alone. The Eighth Circuit has also stated that it “continues to recognize the viability of ... [ADEA disparate impact] claims.” Lewis v. Aerospace Cmty. Credit Union, 114 F.3d 745, 750 (8th Cir.1997); See also EEOC v. McDonnell Douglas Corp., 191 F.3d 948, 950 (8th Cir.1999) (stating that “the law of this circuit is that disparate impact claims are cognizable under the ADEA”). Thus, precedent from other circuits show that a contrary facial interpretation of the RFOA is reasonable.
Moreover, the strongest argument against the language of the RFOA exception precluding disparate impact lies in the substantive provisions of the ADEA and Title VII. In a similar case, a concurrence by Eleventh Circuit Judge Barkett acutely noted:
[I]n every statutory discrimination case, a decision based upon legitimate business necessity will never support a claim for liability. Griggs itself recognized and repeatedly emphasized that disparate impact is a basis for relief only if the practice in question is not founded on “business necessity,” or lacks “a manifest relationship to the employment.” [401 U.S. 424, 430-31, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)]. [The RFOA exception] of the ADEA adds nothing new.
... In light of the parallels between the substantive provisions of the ADEA and Title VII, and in light of the fact that Congress has amended the ADEA several times but has never explicitly excluded disparate impact claims, a reasonable interpretation of the [RFOA exception] is that it codifies the business necessity exception to disparate impact claims.
Adams, 255 F.3d at 1327-28 (Barkett, J., concurring).
I find Judge Barkett’s reasoning fully persuasive. Under a theory of disparate impact, employers will still be able to have employment practices and policies that may burden over-age workers in a disproportionate way. These practices will be permissible, despite the disproportionate impact, provided the employer shows they are supported by a business necessity. Upon proving business necessity, the burden shifts to the employee to show that the practice in question was established not because of the legitimacy of the necessity, but merely as a pretext for invidious stereotyping. Therefore, I am not persuaded that adopting a disparate impact theory will lead to any inconsistencies with the RFOA exception.
That said, the cornerstone of the majority’s holding relies on an analogous provision in the Equal Pay Act (“EPA”). Because the RFOA exception does not exist under Title VII, the majority looks instead to the EPA, which precludes disparate impact claims via its “any factor other than sex” language. The majority attempts to show that the similarities between the RFOA and EPA “any factor” exception should be construed by courts to demonstrate that the RFOA should similarly prohibit disparate impact. See Washington v. Gunther, 452 U.S. 161, 170, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) (juxtaposing the EPA’s “any factor other than sex” language with Title VII’s broadly inclusive prohibition against gender discrimination and stating that the language “confíne[d] the application of the Act to wage differentials attributable to sex discrimination.”).
The flaw in the majority’s logic is that the terms “any” and “reasonable” are not synonymous. Under the ADEA, an em *201 ployer with a disparate impact policy may be liable for age discrimination if factors relied on were not reasonable. Pursuant to the EPA, however, if an employment policy causes wage differences among men and women workers, the employer will not be liable unless the policy in question was based solely on gender. Thus, the ADEA and EPA exceptions cannot be read to have the same meaning unless the word “reasonable” is omitted from the RFOA exception. In this light, the premise of the majority opinion appears little more than ironic in that when it compares statutory language of the ADEA and Title VII to preclude disparate impact, the court advocates a dissimilar reading of almost identical statutes. Yet, when comparing the ADEA to the EPA, with the intent of precluding disparate impact, the majority applies a similar reading of exceptions which differ significantly. I disagree with the majority’s analytical approach and its reading of Gunther as indicating that the ADEA cannot bar some “reasonable factors other than age” practices which have a disparate impact on workers over forty.
Additionally, the majority’s contention that the ADEA and Title VII are not similar statutes, insofar as their application of the disparate impact theory, disregards the doctrine of in pari materia. It has long been held that judicial interpretations of one statute may be informed by interpretations of similar statutes. Lorillard v. Pons, 434 U.S. 575, 580-81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (“[When] Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.”). Under this well established statutory canon, “the interpretation of one statute may be influenced by language of other statutes which are not specifically related, but which apply to similar persons, things, or relationships.” Nat. Fed’n of Fed. Employees v. Dep’t. of Interior, 526 U.S. 86, 119 S.Ct. 1003, 1013, 143 L.Ed.2d 171 (1999) (defining the doctrine of in pari materia, citing several cases where the Court applied this doctrine to aid in its construction of a variety of statutes, and arguing that the doctrine was now “well established”) on remand, 174 F.3d 393 (4th Cir.1999).
In the context of the ADEA and Title VII, adhering to this canon is particularly well suited because, as the majority concedes, the ADEA grew out of debates on Title VII. Furthermore, in pari materia has relevance because both aforementioned statutes apply to similar persons (here, the employees) and similar relationships (here, the employment context). Moreover, Congress carefully chose identical language for its statutes dealing with both discrimination against older workers and discrimination against those due to race or gender. Therefore, the majority should have applied the doctrine of in pari materia and interpreted the disparate impact theory as applicable to the ADEA.
II. THE ADEA LEGISLATIVE HISTORY
My second point of disagreement with the majority concerns its portrayal of the legislative history of the ADEA. The majority opinion subtly recognizes that the legislative history of the ADEA is not directly on point. Although the majority’s opinion properly recognizes that the Supreme Court’s 1971 endorsement of the disparate impact theory in Griggs, 401 U.S. at 430-31, 91 S.Ct. 849, was later in time than Congress’s enactment of the ADEA in 1967, the majority attempts to support its position by focusing on the underlying purposes of the legislation.
*202 Although the language of Title VII and the ADEA are almost identical, the majority essentially dismisses Griggs as irrelevant to the calculus of age discrimination. The majority distinguishes Griggs from the ADEA on the grounds that Griggs interpreted Congress’s intent underlying Title VII as sweeping in nature. The majority argues, “[i]n contrast to the refined purpose evidenced in the historical underpinnings to the ADEA’s enactment, the Supreme Court’s opinion in Griggs discusses Title VII’s broad remedial purpose.” While it is undoubtably true that Gnggs recognized disparate impact theory as an available tool in the employment discrimination toolbox to remedy past discrimination under Title VII, it does not necessarily follow, as the majority asserts, that the disparate impact tool is available only in a remedial context.
I disagree in two respects with the majority’s holding that disparate impact theory should be limited to the context of Title VII. First, the textual similarity between Title VII and the ADEA evinces a congressional intent to provide similar protection against employment discrimination under the two statutes. Second, it is arguable whether historical discrimination should be a necessary precondition for recognizing a disparate impact theory. I acknowledge, as the majority does, that the ADEA and Title VII are distinct because the former lacks a history tied to past discrimination. In the absence of a clear statement to the contrary, however, I cannot assume that Congress intended to limit the remedial measures available under anti-discrimination statutes with almost identical language merely because the statutes arose out of distinct historical contexts. The Supreme Court in Griggs, for example, did not posit historical discrimination as the sole reason for disparate impact under Title VII; Griggs merely held that a showing of disparate impact was available to remedy this type of discrimination. See Jennifer J. Clemons and Richard A. Bales, ADEA Disparate Impact in the Sixth Circuit, 27 Ohio N.U. L.Rev. 1, 23 (2000). Moreover, the majority’s emphasis on the historical posture of the ADEA and Title VII unduly minimizes the statutes shared aim of ridding from the workplace an environment of concealed discrimination. Griggs, 401 U.S. at 431, 91 S.Ct. 849 (stating that Title VII “proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation”); EEOC v. Wyoming, 460 U.S. 226, 231, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (stating that the ADEA seeks to remedy “arbitrary” forms of age discrimination “based in large part on stereotypes unsupported by objective facts, and often defended on grounds different from its actual causes”). Consistent with such an aim, a disparate impact theory may be a plaintiffs only tool in counteracting sophisticated discrimination. Therefore, due to the similarity of the ADEA and Title VII language, it is my view that the protection available under both statutes, including that from disparate impact, should also be similar.
The majority ignores the fact that Griggs does not stand alone as the only relevant decision applying disparate impact theory. Under Supreme Court precedent, the disparate impact theory has grown beyond its original purpose of alleviating racial discrimination claims. See Dothard v. Rawlinson, 433 U.S. 321, 329-32, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (applying disparate impact theory to Title VII sex discrimination claims). Furthermore, under the 1991 Civil Rights Act, 42 U.S.C. § 2000-e2(k)(l)(A)(I) (1994), disparate impact claims are readily available not only to plaintiffs alleging racial discrimination, but also to those claiming discrimination on the basis of gender, national origin, *203 and religion.[7] In light of these developments, I cannot agree with the majority that the ADEA must be limited solely to disparate treatment claims.
I also do not agree with the majority’s interpretation of the most prominent documentation of all ADEA legislative history, the Wirtz Report.[8] The majority uses the Report to bolster its argument that the ADEA was not premised on eradicating past discrimination. The flaw with the majority’s use of this most critical evidence of congressional intent is its failure to acknowledge the argument, embodied within the Wirtz Report, that age discrimination was in fact “based in large part on stereotypes unsupported by objective fact, and was often defended on grounds different from its actual cause.” See EEOC, 460 U.S. at 231, 103 S.Ct. 1054. The aforementioned conclusion seems to indicate that the ADEA’s purpose may not have been limited to eradicating animus, as the majority suggests. Rather, and in contrast to the majority’s view, the Wirtz Report indicates that Congress merely intended to utilize the ADEA to eliminate stereotypes that workers’ productivity declines with age. That said, I acknowledge that the Wirtz Report is supportive evidence of Congress’s intent concerning the ADEA and that the Report did in fact distinguish age discrimination as “rarely based on the sort of animus motivating some other forms of discrimination.” My position merely suggests that because the Wirtz Report sheds the best light on Congress’s intent in enacting the ADEA, a point the majority does not refute, this Report arguably provides more support for affirming, rather than denying, that the ADEA contains a disparate impact cause of action.
Furthermore, the legislative intent indicating that Congress meant to allow the disparate impact theory in ADEA actions may be discerned from a Congressional amendment. In 1994, Congress amended the ADEA by adding the Older Workers Benefit Protection Act (“OWBPA”). 29 U.S.C. § § 623, 626, 630® (1994). The statute requires an employer to provide the employee with information regarding the ages of workers offered severance pay and those who were not let go before the employee waives any potential discrimination claims. 29 U.S.C. § 626(f)(l)(E)-(G), (H)(ii) (1994). These statistics, comparing the ages of those terminated and those retained, would be of little relevance if the employee could not bring a disparate impact claim. Therefore, the addition of the OWBPA is additional evidence that the disparate impact theory should be available under the ADEA.
*204 III. CONCLUSION
The majority today fails to heed the Griggs recognition that in a complex society, not all discrimination is apparent or overt. Often, such discrimination will be subtle and concealed. The practical consequence of the majority’s decision is that it will allow an employer to exclude older workers from lower-level jobs simply on the basis of pretext, without an additional tool at the employee’s disposal to counteract such sophisticated discriminatory acts. Contrary to the majority’s stance, I agree with the Supreme Court’s determination in Hazen that the disparate impact liability was designed to detect employment decisions that reflect “inaccurate and stigmatizing stereotypes.” 507 U.S. at 610, 113 S.Ct. 1701. Thus, I find no incompatibility with using disparate impact theory to prove liability under the ADEA.
Instead, I am concerned that by not allowing a disparate impact cause of action under the ADEA, the majority has essentially held such plaintiffs to the heightened evidentiary standard of Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), where sophisticated and concealed discrimination must be proved solely through intentional acts. The majority, however, fails to fully absorb the spirit of Justice Stevens’s concurrence in Davis that “the line between purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the court’s opinion may assume.” Id. at 254, 96 S.Ct. 2040. Applied to our context, Justice Stevens’s concurrence demonstrates that the majority’s opinion, which distinguishes between intentional discrimination based on disparate treatment on the one hand and a disparate impact cause of action absent proof of intent on the other, may not be as clear as the majority seems to opine. Therefore, with regards to Part III of the majority opinion, I respectfully dissent.

. Mullin v. Raytheon Co., 164 F.3d 696, 703-04 (1st Cir.1999) cert. denied, 528 U.S. 811, 120 S.Ct. 44, 145 L.Ed.2d 40 (1999).

. DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 732 (3d Cir.1995).

. Lyon v. Ohio Educ. Ass’n and Prof'l Staff Union, 53 F.3d 135, 139 n. 5 (6th Cir.1995).

. EEOC v. Francis W. Parker School, 41 F.3d 1073, 1076-77 (7th Cir.1994).

. Ellis v. United Airlines, Inc., 73 F.3d 999, 1006-07 (10th Cir.1996).

. Adams v. Fla. Power Corp., 255 F.3d 1322, 1325 (11th Cir.2001).

. Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, provides in pertinent part:
Sec. 703. (k)(l)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if— (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity;
42 U.S.C. § 2000e-2 (2003).

. The terrn “Wirtz Report” refers to a congressional report commissioned by the former Department of Labor Secretary W. Willard Wirtz which, pursuant to section 715 of Title VII, instructed the Secretary of Labor to conduct a study with recommendations for "legislation to prevent arbitrary discrimination in employment because of age.” The origins of the ADEA’s rationales and objectives can be traced to the resulting report entitled, The Older American Worker: Age Discrimination in Employment (1965). See also EEOC, 460 U.S. at 229-31, 103 S.Ct. 1054 (tracing legislative history of the ADEA and central role of the Secretary of Labor Report).