# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 7, 2005         Decided July 8, 2005

No. 04-1137

NATIONAL TREASURY EMPLOYEES UNION,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

UNITED STATES CUSTOMS AND BORDER PROTECTION,
UNITED STATES DEPARTMENT OF HOMELAND SECURITY
INTERVENOR

———

On Petition for Review of an Order of the
Federal Labor Relations Authority

———

*Elaine D. Kaplan* argued the cause for the petitioner. *Gregory O'Duden* and *Larry J. Adkins* were on brief.

*James F. Blandford*, Attorney, Federal Labor Relations Authority, argued the cause for the respondent. *David M. Smith*, Solicitor, Federal Labor Relations Authority, and *William R. Tobey*, Deputy Solicitor, Federal Labor Relations Authority, were on brief.

*Peter D. Keisler*, Assistant Attorney General, United States Department of Justice, *William G. Kanter*, Deputy Director*,* and *Sandra W. Simon*, Attorney, were on brief for the intervenor. *E. Roy Hawkens*, Attorney, entered an appearance.

Before: GINSBURG, *Chief Judge*, and HENDERSON and RANDOLPH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Granting the exceptions taken by the United States Department of the Treasury's Customs Service[1] (Customs), the Federal Labor Relations Authority set aside an arbitration award in favor of the National Treasury Employees Union (NTEU). *See United States Dep't of the Treasury Customs Serv., Washington, D.C. (Agency) & Nat'l Treasury Employees Union (Union)*, 59 FLRA 703 (2004) (*Customs Order*), *reprinted in* Joint Appendix (J.A.) at 271-96. The NTEU now petitions for review of the Authority's order, alleging that the Authority erred twice: initially, by concluding that Customs exercised statutorily protected management rights when it implemented a revised National Inspectional Assignment Policy (NIAP); and, again, by concluding that, assuming *arguendo* that Customs in fact exercised its managements right in implementing the revised

---

[1] At the time this suit was initiated, the Customs Service was a bureau within the Treasury Department. The Homeland Security Act of 2002, however, transferred the Customs Service to the United States Department of Homeland Security, whereupon it was renamed the Bureau of Customs and Border Protection. *See* Pub. L. No. 107-296, § 1502, 2002 U.S.C.C.A.N. (116 Stat.) 2135, 2308; Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32, at 4 (2003); *see also* 6 U.S.C. § 203(a)(1). Given the name change and for the sake of convenience, we refer to the then-"Customs Service"/now-"Bureau of Customs and Border Protection" simply as "Customs."

NIAP, Customs was not obligated to bargain over the NTEU's ground rule proposal. Because the Authority erred in neither respect, we deny the NTEU's petition.

## I.

The Federal Service Labor-Management Relations Statute (FSLMRS or Statute), 5 U.S.C. §§ 7101-7135, "establishes a collective bargaining regime in the federal public sector." *Ass'n of Civilian Technicians v. FLRA*, 353 F.3d 46, 49 (D.C. Cir. 2004) (citing *United States Dep't of the Navy v. FLRA*, 952 F.2d 1434, 1438 (D.C. Cir. 1992)). This controversy involves the Statute's management rights doctrine codified in section 7106. *See* 5 U.S.C. § 7106. While the Statute generally obligates an agency to negotiate with its employees' bargaining representative over "conditions of employment," *id.* § 7103(a)(12)—*i.e.*, "personnel policies, practices, and matters . . . affecting working conditions," *id.* § 7103(a)(14)—section 7106 "reserv[es] to management officials the authority to, *inter alia*, make budget, organization, and work assignments."[2] *FLRA*

---

[2] Section 7106 provides:

> (a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency--
>
> (1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency; and
>
> (2) in accordance with applicable laws--
>
>> (A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;

*v. United States Dep't of Justice*, 994 F.2d 868, 871-72 (D.C. Cir. 1993). Nonetheless, these rights of unilateral action, which are permissive subjects of bargaining, *see Nat'l Treasury Employees Union v. FLRA*, 399 F.3d 334, 340 & n.5 (D.C. Cir. 2005), are not unqualified. An agency exercises management

---

(B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;

(C) with respect to filling positions, to make selections for appointments from--

(i) among properly ranked and certified candidates for promotion; or

(ii) any other appropriate source; and

(D) to take whatever actions may be necessary to carry out the agency mission during emergencies.

(b) Nothing in this section shall preclude any agency and any labor organization from negotiating--

(1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

(2) procedures which management officials of the agency will observe in exercising any authority under this section; or

(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

5 U.S.C. § 7106.

rights subject to bargaining over the "impact and implementation" of the rights. *Dep't of the Navy v. FLRA*, 962 F.2d 48, 50 (D.C. Cir. 1992). "Nothing in this section," the Statute says, "shall preclude any agency and any labor organization from negotiating" over either "procedures which management officials of the agency will observe in exercising any authority under this section . . . or appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials." 5 U.S.C. § 7106(b)(2)-(3). Thus, "although an agency is not required to bargain with respect to its management rights *per se*, it is required to negotiate about the impact and implementation of those rights." *Dep't of the Navy*, 962 F.2d at 50 (internal quotation marks omitted & emphasis in original). Under the Statute, all bargaining must be carried out in "good faith." *Id.* § 7114(a)(4), (b).

The distinction between an agency's exercise of management rights and its obligation to engage in impact and implementation bargaining is the crux of this controversy, which has its genesis in Customs' revised policy governing the assignment of Customs inspectors to tours of duty and overtime work known as the National Inspection Assignment Policy (NAIP). Customs and the NTEU, which represents "a nationwide unit" of Customs Service employees, including Customs inspectors, have negotiated a series of national level collective bargaining agreements (NLAs). The most recent NLA (and the one the parties were abiding by when this dispute arose) expired in 1999.

In 1993, the Congress passed the Customs Officers Pay Reform Act (COPRA), which overhauled the overtime system applicable to Customs inspectors. *See* Pub. L. No. 103-66, § 13811(a), 107 Stat. 312 (1993) (codified at 19 U.S.C. § 267). To implement COPRA, that same year Customs and the NTEU formed a joint labor-management committee, whose work

culminated, two years later, with the NIAP. *See* J.A. 272. The NIAP was developed independently of the 1999 NLA.

At the time the NIAP was formulated, Customs, along with all other federal agencies, was required under Executive Order 12871 to negotiate over the permissive subjects of bargaining set forth in section 7106(b)(1) of the FSLMRS. *See* 58 Fed. Reg. 52,201 (Oct. 1, 1993). Section 7106 identifies the subjects as "the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work." 5 U.S.C. § 7106(b)(1). In 2001, however, President George W. Bush revoked Executive Order 12871 by issuing Executive Order 13203. *See* 66 Fed. Reg. 11,227 (Feb. 17, 2001).

Following Executive Order 13203, Customs advised the NTEU that it no longer intended to negotiate over permissive subjects of bargaining as previously required by article 5, section 2, of the NLA. In that section of the NLA, Customs agreed, "[i]n the interest of partnership, . . . to bargain with the Union over the numbers, types and grades of employees or positions assigned to any Customs Service organizational subdivision, work project or tour of duty, and the technology, methods and means of performing work within the Service." J.A. 273. Customs further advised the NTEU that it no longer considered itself bound by provisions of agreements—including the NLA and the NIAP—relating to permissive subjects of bargaining. Customs transmitted to the NTEU a draft of a revised NIAP that it planned to implement on September 30, 2001.

A correspondence battle ensued during August and September of 2001, only the salient aspects of which we recount now. On August 6, the NTEU invoked its right to bargain over the impact and implementation of the revised NIAP and served notice of its intent to renegotiate the expired NLA. Customs responded on

August 16 by repeating its planned implementation of the revised NIAP on September 30, 2001. The following day, the NTEU iterated its intent to "open the entire term agreement," highlighting various provisions which, it claimed, bore a "direct connection" to the NIAP and to its section 7106 rights. On August 22, Customs informed the NTEU that it was prepared to "work out" ground rules to govern renegotiation of the expired NLA but that, as to the proposed revised NIAP, Article 37 of the expired NLA "establishes standard ground-rules for the negotiation of interim topics such as the revised NIAP." J.A. 46-47. The NTEU replied the next day, stating that "actual negotiations" could not begin on any topic "until the parties have reached agreement on ground rules." J.A. 47A. On August 27, Customs again declared that the ground rules set forth in Article 37 of the expired NLA governed negotiations over the revised NIAP.

On August 29, Customs and the NTEU met to discuss ground rules but to no avail. They exchanged correspondence the following day: Customs stated it did not "agree to merge," as the NTEU had proposed, negotiations over the revised NIAP with those regarding the expired NLA, while the NTEU said it "continues to believe that concerns associated with" the NIAP "should be addressed as part of the overall negotiations" on the expired NLA. J.A. 53-54. In its letter, the NTEU also proposed that the existing NIAP be "rolled-over," subject to a few specified revisions. J.A. 55. Customs responded that it did not intend to delay the implementation of the revised NIAP until the parties renegotiated the NLA. On September 6, 2001, Customs had the last word in this exchange: It notified the NTEU that any delay in implementing the revised NIAP "is unacceptable" and, consequently, it "decline[d] to accept the NTEU's suggestion that [it] forego revision and implementation of the NIAP in order to address it during renegotiation of the national agreement." J.A. 56-57.

Believing the parties had reached an impasse over its proposal to negotiate the NIAP and NLA simultaneously, the Union sought assistance from the Federal Mediation and Conciliation Service the day it received Custom's last letter.[3]   Customs proceeded to implement the revised NIAP on October 1, 2001, insisting in a letter to the NTEU that day that, in light of new requirements imposed after the catastrophic attacks by foreign terrorists against our nation's citizens on September 11, 2001, immediate implementation was "critical . . . to ensure the necessary functioning of Customs."   J.A. 65.   The Union responded with a letter of its own and also filed a grievance with the Authority alleging that, by implementing the revised NIAP, Customs violated section 7116(a)(1) and (5) of the FSLMRS. Following submission of the Union's grievance to arbitration, an arbitrator concluded that the parties should bargain over revisions to the NIAP and, consequently, remanded the matter for the parties to negotiate the impact and implementation of the revised NIAP.   Both parties filed exceptions to the arbitrator's award with the Authority—Customs to the award itself, the NTEU to the arbitrator's choice of remedy.

The Authority granted Customs's exceptions and set the award aside. *See Customs Order*, 59 FLRA at 708-11.  At the outset of its analysis, the Authority observed that, because Customs had "proposed a specific change in unit employees' conditions of employment pursuant to the exercise of its management rights under § 7106 of the Statute while the parties were contemplating negotiation of a new term agreement," the case presented an issue of first impression.  *Id.* at 708.  Resolution of the case, it said, turned on Customs's "legal ability, if any, to refuse to

---

[3] The mediator did not break the impasse and on September 21, 2001, the NTEU requested assistance from the Federal Service Impasse Panel, which ultimately declined to exercise jurisdiction over the dispute.

bargain over the [NTEU]'s proposed ground rule requiring [Customs] to combine its proposed impact and implementation bargaining obligation with the negotiation of a term agreement." *Id.* Two possible answers, the Authority observed, carried two different consequences for Customs. *See id.* On the one hand, if Customs could refuse to bargain over the NTEU's proposed ground rule, it explained, "the Union's refusal to engage further in impact and implementation bargaining would permit [Customs] to unilaterally implement its proposed change to conditions of employment." *Id*. If, on the other hand, Customs was required to bargain over the proposed ground rule, Customs "would commit an unfair labor practice by its unilateral implementation of the revised NIAP." *Id.*

The Authority chose the first answer, finding that "the Union's proposed ground rule constitutes a permissive subject of bargaining and, consequently, that the Agency was under no obligation to bargain on that subject as a precondition to impact and implementation of the revised NIAP." *Id.* In articulating the basis of its decision—*i.e.*, "that an agency cannot be compelled to bargain over combining impact and implementation and term bargaining and it has the right to insist that such bargaining proceed on separate tracks"—the Authority delineated two principles. *Id.* First, it noted that "[w]here an agency action constitutes the exercise of a management right" under sections 7106(a) and 7106(b)(1) of the FSLMRS, its "obligation is limited to bargaining over the procedures governing the exercise of the right, under § 7106(b)(2) of the Statute, or appropriate arrangements for employees adversely affected by the exercise of the right, under § 7106(b)(3)." *Id.* Second, relying on our decision in *FLRA v. United States Dep't of Justice*, 994 F.2d 868 (D.C. Cir. 1993), the Authority observed that, because an agency exercising a management right need not bargain over matters beyond the scope of impact and implementation bargaining, its "duty to bargain over ground

rules must be consistent with the parties' obligation to bargain in a particular case." *Id.* at 709.

After finding that the NTEU's right to bargain "was limited to the impact and implementation of the proposed changes in the revised NIAP," *id.* at 711; *see also id.* at 708, because implementation of the revised NIAP involved the exercise of a statutory management right, the Authority then considered whether the NTEU's "proposed ground rule addresse[d] only procedures or appropriate arrangements relating to the change in conditions of employment proposed" by the revised NIAP. *Id.* at 710. "Clearly, it does not," the Authority concluded, because "[b]ased on the record, there is no question but that bargaining over a new term agreement would extend beyond the narrow scope of issues related to the procedures and appropriate arrangements governing implementation of the revised NIAP." *Id.* While it acknowledged that the NTEU "identified provisions of the NLA that related to the NIAP that it wished to discuss in term negotiations," the Authority found that "it also demanded to bargain over other, unrelated provisions of the NLA as well." *Id.* Therefore, the Authority concluded, because the "Union proposed, as a condition precedent to bargaining over the impact and implementation of the revised NIAP, that [Customs] agree to bargain that matter as a part of bargaining over a new term agreement," the Union's ground rule "exceeded the scope of impact and implementation bargaining and [Customs] had no obligation to bargain over [it]." *Id.*

The Authority additionally explained that, because the proposed ground rule sought in effect a waiver of Customs's right to bargain only over those procedures and arrangements related to the revised NIAP, it constituted a "permissive subject of bargaining." *Id.* at 710. Consequently, in the Authority's view, Customs had the "right not only to refuse to bargain to impasse over the matter, but also to implement the revised NIAP without completing bargaining." *Id.* Therefore, the Authority

concluded, Customs did not violate the FSLMRS by implementing the revised NIAP on October 1, 2001. *See id.*

The Authority further reasoned that a contrary rule—*i.e.*, one "*requiring* agencies to bargain [over] a ground rule conditioning impact and implementation bargaining on the negotiation of a term agreement,"—would, to its mind, "frustrate the compromise reached by Congress in enacting § 7106." *Id.* (emphasis in original). Such a rule "would not," the Authority explained, "give full effect to the place of management rights in the statutory scheme because it would tie the exercise of a right to objectives that have nothing to do with the purposes for which the right was being exercised." *Id.* Indeed, the Authority observed, "it would be exceedingly anomalous if a union could achieve through ground rules bargaining an expansion of negotiations that it could not accomplish through bargaining over procedures and appropriate arrangements." *Id.* at 711.

Because Customs' "implementation of the revised NIAP, in the face of a proposal over which it was not obligated to bargain, was, therefore, not a violation of the Statute," the Authority concluded that the arbitrator erred as a matter of law in deciding otherwise and set his award aside.[4] *Id.* The NTEU then timely

---

[4] Member Pope concurred in the judgment but declined to join the majority opinion because, as she saw it, "the problem with the proposed ground rule . . . was that it sought to combine bargaining over unrelated provisions in the term agreement with impact and implementation bargaining." *Id.* at 712. "[I]f the Union had limited its bargaining request to related, mandatory provisions of the term agreement," she asserted, Customs "would have been required to bargain over these provisions prior to implementing the change." *Id.* She also disagreed with the majority's conclusion that the NTEU's proposed ground rule sought a waiver of Customs' right to bargain only over procedures and appropriate arrangements regarding the revised NIAP. *See id.* "This case," she claimed, "is about bargaining over unrelated matters; waiver has nothing to do with it." *Id.*

filed a petition for review pursuant to 5 U.S.C. § 7123(a).

## II.

We begin with the standards by which we review the Authority's order. First, there is the familiar Administrative Procedure Act standard, *see* 5 U.S.C. § 7123(c) (incorporating 5 U.S.C. § 706): "[W]hen acting 'within its authority' and 'consistent with the congressional mandate,' the Authority's decision may only be set aside if it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Ass'n of Civilian Technicians v. FLRA*, 250 F.3d 778, 782 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(A); *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 & n.7, 98 & n.8 (1983)); *see also AFGE Local, 2343 v. FLRA*, 144 F.3d 85, 88 (D.C. Cir. 1998). In addition there is the classic two-step methodology governing the Authority's interpretation of the Statute: If the Congress "has directly spoken to the precise question at issue," the court "give[s] effect to [its] unambiguously expressed intent," but if the statute is silent or ambiguous the court defers to the Authority's interpretation so long as it is "based on a permissible construction of the statute." *Chevron USA Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *see also Dep't of the Air Force v. FLRA*, 294 F.3d 192, 196 (D.C. Cir. 2002). These standards are deferential ones, for, as the Supreme Court has reminded us, the Authority—not this court—is the expert on federal labor relations. Because "the Authority's function is 'to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act,' . . . it 'is entitled to considerable deference when it exercises its "special function of applying the general provisions of the Act to the complexities" of federal labor relations.' " *Nat'l Fed'n of Fed. Employees v. Dep't of the Interior*, 526 U.S. 86, 99 (1999) (quoting *Bureau of Alcohol, Tobacco & Firearms*, 464 U.S. at 97 (in turn quoting *NLRB v.*

*Erie Resistor Corp.*, 373 U.S. 221, 236 (1963))). The application of these deferential standards of review is fatal to NTEU's two arguments, each of which we take up—and reject—in turn.

The NTEU's opening attack is on the Authority's conclusion that Customs exercised its statutory management rights in proposing revisions to the NIAP. According to the NTEU, the Authority's "erroneous premise" falls apart once it is recognized that the proposed revisions altered "pre-existing negotiated procedures and appropriate arrangements," a topic outside Customs' statutory management rights and therefore within Customs' duty to bargain. Petitioner's Br. at 32. That is, in the NTEU's words: "[W]hen Customs proposed to replace the negotiated procedures and appropriate arrangements of [the NIAP] with new procedures and appropriate arrangements . . . it was proposing a change in conditions of employment over which it had a substantive obligation to bargain." Petitioner's Br. at 34.

The NTEU's *Chevron* step-one argument—*i.e.*, that the Authority mischaracterized the implementation of the NIAP as the exercise of a management right rather than as a bargainable change to appropriate arrangements and procedures—is a non-starter at best. The NTEU is right that the language and structure of section 7106 manifest a "deliberate distinction" between an agency's management rights, on the one hand, and matters subject to bargaining on the other. Petitioner's Br. at 33. The language of the statute does indeed qualify the management rights: The phrase "nothing . . . shall affect the authority of any management official of any agency" begins subsection (a), while the provision that "[n]othing . . . shall preclude any agency and any labor organization from negotiating" introduces the matters set forth in subsection (b). 5 U.S.C. § 7106(a)-(b). Subsection (b), moreover, identifies two subjects of mandatory negotiation: "procedures which

management officials of the agency will observe in exercising any authority under this section," *id.* § 7106(b)(2), and "appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials," *id.* § 7106(b)(3). The distinction between management rights and negotiable matters is further reinforced by the statute's structure, which (with the exception of subsection (b)(1)) divides management rights from the negotiable matters by placing them in different subsections, *compare id.* § 7106(a), *with id.* § 7106(b)(2)-(3)—a division highlighted by the statute's command that actions under subsection (a) be taken "[s]ubject to" subsection (b). *Id.* § 7106(a). But the NTEU's insistence that Customs' subsection (a) management rights must be exercised "[s]ubject to" subsection (b)(2) procedures and subsection (b)(3) appropriate arrangements does little to advance its argument, the gravamen of which is that the Authority wrongly concluded that Customs' revision constitutes the exercise of management rights rather than the alteration of procedures and arrangements by which it exercises those rights. In other words, it does not, as the NTEU contends, "follow necessarily" from either the statutory structure or text that the NIAP falls into section 7106's negotiable procedures and arrangements category rather than the management rights category.

The gist of NTEU's argument on this point appears to be based on its view that "it is clear that several significant provisions of the NIAP had no relationship whatsoever to the exercise of any management right," a view it supports by citing various "procedures and appropriate arrangements that the parties had previously negotiated to govern the exercise of Customs's authority to assign work" resulting from the revisions. Petitioner's Br. at 32. The Authority, however, reached a contrary conclusion. The NIAP involves management rights, it said, because its review of the revised NIAP "indicate[d] that the revised NIAP constitutes, among other

things, criteria governing employee work assignments, under § 7106(a)(2)(B) of the Statute, and staffing patterns, under § 7106(b)(1)." *Customs Order*, 59 FLRA at 708 n.16. While the Authority's analysis is unquestionably terse, its characterization is borne out by the administrative record. The revised NIAP specifically provides that management decisions pertaining to, *inter alia*, scheduling, staffing levels and overtime are to be governed by "operational needs" and "budgetary limitations." J.A. 30-32. We have, in the past, recognized that the specification of "criteria pursuant to which substantive decisions are to be made," such as, in this case, "operational needs" and "budgetary limitations," comes within the exercise of management rights. *See Dep't of Treasury v. FLRA*, 857 F.2d 819, 821 (D.C. Cir. 1988). We do so again with respect to the revised NIAP.

The NTEU also argues that, in concluding the revised NIAP implicates management rights, the Authority departed from an earlier decision—*United States Dep't of Treasury, Customs Serv. Region IV, Miami Dist., Miami, Fla. (Respondent) & Nat'l Treasury Employees Union (Charging Party)*, 38 FLRA 838 (1990) (*Miami Customs*)—without explanation. *Miami Customs*, according to the NTEU, "demonstrates that Customs was obligated to bargain over the substance of its decision to revise [the] NIAP, not merely its impact and implementation." Petitioner's Br. at 34. We do not agree. In *Miami Customs*, the Authority held that the Miami District Customs Service violated the FSLMRS in implementing a new rotation system after refusing to bargain over a negotiable union proposal addressing the length of an inspector's time on a given assignment. *See Miami Customs*, 38 FLRA at 844. Unless a proposal involving the right to assign work directly interferes with the exercise of a management right, the Authority explained, it is negotiable. *See id.* at 842. Accordingly, because "proposals which address only the length of an assignment within such a rotation schedule do not interfere with

the management's right to assign work," the Miami District Customs Service was obligated to bargain over the union's proposal. *Id.* at 843. Nothing in *Miami Customs* at all undermines the Authority's conclusion that Customs' specification in the revised NIAP of substantive criteria governing management decisions pertaining to scheduling, staffing and overtime was the exercise of a management right and therefore not a matter over which Customs had a mandatory duty to bargain under the Statute.

We find the NTEU's next argument—*i.e.*, even assuming that Customs exercised its management rights in implementing the revised NIAP, it was nevertheless obligated to bargain over the proposed ground rule regarding the timing of bargaining over both the NIAP and a new NLA—wanting as well. The Authority's conclusion in this regard, the NTEU maintains, stems from a misapplication of the analysis we outlined in *FLRA v. United States Dep't of Justice*, 994 F.2d 868 (D.C. Cir. 1993), to its ground rule proposal and produces "an anomalous result that undermines the statutory purposes."[5] Petitioner's Br. at 50.

---

[5] The NTEU also maintains that Customs was obligated under Authority precedent to bargain over its proposed ground rule because it was offered in good faith and designed to advance—not impede—the bargaining process. *See* Petitioner's Br. at 39-46. The Authority responds that the NTEU waived this argument. *See* Respondent's Br. at 31 n.11. Although the NTEU offered record citations purporting to refute the Authority's charge, *see* Petitioner's Rep. Br. at 11-12 n.6, it failed to provide us with the cited pages until after we directed it to do so at oral argument. *See* Letter from Elaine Kaplan, Senior Deputy General Counsel, to Mark Langer, Clerk of D.C. Circuit Court of Appeals, at 1 (Feb. 8, 2004). Our review of its subsequent submission convinces us that the NTEU has indeed waived this argument because it appears nowhere in the cited pages—or the eight additional unsolicited pages the NTEU submitted with them. *See* 5 U.S.C. § 7123(c) ("No objection that has not been urged before the

Not so. Because it constitutes a reasonable interpretation of the mutual statutory duty to bargain in good faith, *see* 5 U.S.C § 7114(a)(4), (b), we uphold the Authority's conclusion that Customs was not obligated to bargain over a ground rule proposal that is inconsistent with the parties' specific obligation to bargain in this case—that is, in the Authority's words, one that "exceeded the scope of impact and implementation bargaining." *Customs Order*, 59 FLRA at 810.

First, we cannot say the Authority misapplied our *Dep't of Justice* decision here. There, we addressed a petition for enforcement of an Authority order requiring the San Diego Border Patrol to bargain over the impact and implementation of a relocation of employees to various locations in San Diego County. *See Dep't of Justice*, 994 F.2d at 870-72. We held that the Border Patrol did not violate the FSLMRS in refusing to bargain over the union's proposal to use the vacated space resulting from the relocation. *See id.* at 873. We explained that "the term 'impact and implementation' includes only the procedures which management officials of the agency will observe in exercising management rights and appropriate arrangements for employees adversely affected by the exercise of such rights." *Id.* at 872 (further internal quotation marks & citations omitted). The "disputed subject matter" did not "fit[] within either of those subsets," we concluded, because it was "clear that the creation of an office for the Union has nothing to do with the procedures used by management for the resource and personnel allocation involved in the decentralization of the unit." *Id.*

---

Authority . . . shall be considered by the court."); *Dep't of Treasury v. FLRA,* 707 F.2d 574, 579 (1983) ("[W]e cannot *review* issues that an agency never placed before the Authority." (emphasis in original)); *see also Equal Employment Opportunity Comm'n v. FLRA*, 476 U.S. 19, 23 (1986). The NTEU is a frequent litigant in our court and its counsel is cautioned against attempting to lead us astray in the future.

Here, the Authority's conclusion that the "limitation on the scope of impact and implementation bargaining" in *Dep't of Justice* is "no different when the question . . . concerns an agency's obligation to bargain over the ground rules for negotiating over the impact and implementation of an exercise of a management right," *Customs Order*, 59 FLRA at 709, derives from our declaration in *Dep't of Justice* that a " 'proposal must address adverse effects flowing from the exercise of a protected management right.' " 994 F.2d at 872 (quoting & citing *United States Dep't of Treasury v. FLRA*, 960 F.2d 1068, 1073 (D.C. Cir. 1992)). As the Authority recognized, it "would be exceedingly anomalous" if the NTEU could use a ground rule proposal to expand the scope of negotiations beyond that of impact and implementation bargaining itself. *Customs Order*, 59 FLRA at 711. Furthermore, we cannot help but note that the Authority's interpretation is wholly consistent with other precedent. Its observation fifteen years ago that "ground rules proposals must, at a minimum, be designed to further, not impede, *the bargaining for which the ground rules are proposed*," *United States Dep't of the Air Force Headquarters, Air Force Logistics Command, Wright-Patterson Air Force Base, Ohio (Respondent) & AFGE, Council 214 (Charging Party)*, 36 FLRA 524, 533 (1990) (emphasis added), is simply another way of stating that "the duty to bargain over ground rules must be consistent with the parties' obligation to bargain in a particular case." *Customs Order*, 59 FLRA at 709.

Moreover, the Authority's interpretation of the mutual statutory duty to bargain in good faith makes sense even without resort to supporting precedent. Notwithstanding the NTEU's contrary characterization, the Authority did not conclude that an agency is never obligated to bargain over a ground rule proposal to combine negotiations; rather, it held only that Customs was under no such duty to do so in this instance because the NTEU's "proposed ground rule exceeded the scope of impact and

implementation bargaining." *Customs Order*, 59 FLRA at 710. The Authority's holding, as it noted, advances statutory objectives we also recognize. In the past, we have stated that "[b]y ascribing certain management rights to agencies, but tempering those rights through the requirements of impact and implementation bargaining" the Congress balanced "the agency's need to manage itself efficiently and the employees' right to participate in the decisions that affect them." *Dep't of the Navy*, 962 F.2d at 50 n.1. We described the balance as a "delicate" one, *id.*, and we think the Authority reasonably determined that the balance would be upset if the NTEU could use a ground rule proposal to require Customs to negotiate on matters unrelated to the impact and implementation of the revised NIAP. Not only would the inevitably resulting delay in implementing the revised NIAP frustrate the Statute's "larger goal of promoting 'an effective and efficient government,' " *Dep't of Treasury,* 857 F.2d at 822 (quoting & citing 5 U.S.C. § 7101(b)), but requiring Customs to bargain over such a proposal would diminish the role of management rights in the statutory scheme by conditioning their exercise on bargaining over matters having nothing to do with the exercise of the rights themselves. *Cf. Dep't of Justice*, 994 F.3d at 872 (To fall within subparagraph(b)(3) "proposal must address adverse effects flowing from the exercise of a protected management right."). Because it is clear to us, as it was to the Authority, that bargaining over the terms of a new NLA would necessarily extend further and take longer than bargaining over the impact and implementation of Customs' revised NIAP, we conclude that the Authority reasonably upheld both the Customs' refusal to consider NTEU's proposal to bargain over the two matters simultaneously as well as Customs' implementation of the revised NIAP.

20

*  *  *

For the foregoing reasons, we deny the NTEU's petition for review.

*So ordered.*