# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 27, 2006          Decided June 27, 2006

No. 05-1266

NATIONAL TREASURY EMPLOYEES UNION,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

UNITED STATES CUSTOMS AND BORDER PROTECTION,
INTERVENOR

———

On Petition for Review of an Order of the
Federal Labor Relations Authority

———

*Robert H. Shriver, III* argued the cause for the petitioner. *Gregory O'Duden*, *Elaine D. Kaplan* and *Larry J. Adkins* were on brief.

*James F. Blandford*, Attorney, Federal Labor Relations Authority, argued the cause for the respondent. *William R. Tobey*, Deputy Solicitor, Federal Labor Relations Authority, was on brief.

*William G. Kanter*, Deputy Director, United State Department of Justice, argued the cause for the intervenor. *Peter D. Keisler*, Assistant Attorney General, and *Howard S. Scher*, Attorney, United States Department of Justice, were on

brief.  *Sandra W. Simon*, Attorney, United States Department of Justice, entered an appearance.

Before: SENTELLE, HENDERSON and RANDOLPH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*:  The National Treasury Employees Union (NTEU) seeks review of a decision of the Federal Labor Relations Authority (FLRA or Authority) upholding an arbitration award in favor of the United States Bureau of Customs and Border Protection (Customs).[1]  *NTEU Chapter 143*, 60 F.L.R.A. No. 167 (May 16, 2005) (FLRA Dec.).  Before October 2001 Customs was bound under the terms of its 1995 National Inspectional Assignment Policy (NIAP) and a National Labor Agreement (NLA) to bargain with NTEU Chapter 143 (Chapter 143) over changes in rotation and regular days off (RDOs) for its El Paso, Texas passenger customs inspectors.  In its decision the FLRA concluded that Customs effectively revoked its consent to bargain over rotation and RDOs in 2001 when it implemented its revised NIAP (RNIAP), which by its terms superseded both the 1995 NIAP and the NLA, which had expired in 1999.  Because the FLRA's decision is not arbitrary, capricious or otherwise contrary to law, we deny the NTEU's petition for review.

---

[1]The United States Customs Service was a part of the United States Department of the Treasury until the Homeland Security Act of 2002 transferred it to the United States Department of Homeland Security where it was renamed the Bureau of Customs and Border Protection.  *See* Pub. L. No. 107-296, § 1502, 116 Stat. 2135, 2308 (2002); *see also* 6 U.S.C. § 203(a)(1).  For convenience, the opinion refers to the agency in either incarnation as "Customs."

3

## I.

This case involves a continuing dispute between the NTEU and Customs over the extent of Customs' obligation to bargain over changes wrought pursuant to the RNIAP. Although the Federal Service Labor-Management Relations Statute (Statute), 5 U.S.C. §§ 7101 *et seq.*, "generally obligates an agency to negotiate with its employees' bargaining representative over 'conditions of employment,' *id.* § 7103(a)(12)—*i.e.*, 'personnel policies, practices, and matters . . . affecting working conditions,' *id.* § 7103(a)(14)," section 7106 of the Statute " 'reserv[es] to management officials the authority to, *inter alia*, make budget, organization, and work assignments.' " *NTEU v. FLRA*, 414 F.3d 50, 52-53 (D.C. Cir. 2005) (quoting *FLRA v. U.S. Dep't of Justice*, 994 F.2d 868, 871-72 (D.C. Cir. 1993)) (alteration in original). Section 7106(b)(1) identifies permissive subjects of bargaining involving such management rights over which bargaining may take place "at the election of the agency," namely, "on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work." 5 U.S.C. § 7106(b)(1); *see Nat'l Ass'n of Gov't Employees, Local R5-136 v. FLRA*, 363 F.3d 468, 471 (D.C. Cir. 2004) (quoting *Am. Fed'n of Gov't Employees, Local 2441 v. FLRA*, 864 F.2d 178, 180 (D.C. Cir. 1988)) (*Local R5-136* ). " 'As to these decisions, the agency is permitted but not required to negotiate with the labor organization.' " *Local R5-136*, 363 F.3d at 471. "These rights of unilateral action," however, "are not unqualified. . . . '[A]lthough an agency is not required to bargain with respect to its management rights *per se*, it is required to negotiate about the impact and implementation of those rights.' " *NTEU v. FLRA*, 414 F.3d at 53 (quoting *Dep't of the Navy v. FLRA*, 962 F.2d 48, 50 (D.C. Cir. 1992)) (alterations added). Further, as the FLRA has interpreted the Statute, the mandatory bargaining obligation over impact and implementation attaches only at "the level of exclusive

recognition," which in the case of bargaining between Customs and the NTEU is at the national level, so that bargaining over impact and implementation below that level is permissive. *See NTEU Chapter 137*, 60 F.L.R.A. 483, 486 (2004) (citing *U.S. Food & Drug Admin.*, 53 F.L.R.A. 1269, 1274 (1998); *Dep't of Defense Dependents Sch.*, 12 F.L.R.A. 52, 53 (1983)).

In 1993 the President issued Executive Order 12871 directing that all federal agencies "negotiate over the subjects set forth in 5 U.S.C. 7106(b)(1)," 58 Fed. Reg. 52,201, 52,203 § 2(d) (Oct. 1, 1993), that is, the permissive subjects of bargaining explicitly set out there. In accordance with the executive order, the 1995 NIAP required that such subjects as workweek length, work hours, scheduling, staffing levels and days off be negotiated and determined at the local level. *See* NIAP § 5(A), JA 158-62. Accordingly, Customs agreed in the NLA to bargain locally over various permissive subjects of bargaining, including, specifically, work station rotation. NLA Article 20, section 15.B specifically provided that Customs "will give timely notice and the opportunity to bargain . . . when a change is to be made in an established rotation system which has an impact, or one which is [sic] reasonably foreseeable, on conditions of employment," JA 235, and Article 37, section 6.B stipulated that "[p]roposed changes which apply within one (1) organizational office"—such as the El Paso rotation system—"will be negotiated within that office," that is, at the local level, JA 243. Thus, under the NLA, recurring rotation regimes that applied only locally were required to be negotiated locally. The NLA expired in 1999.

On February 17, 2001 Executive Order 12871 was revoked by Executive Order 13203, 66 Fed. Reg. 11,227 (Feb. 17, 2001), which directed that all executive agencies "promptly move to rescind any orders, rules, regulations, guidelines, or policies

implementing or enforcing Executive Order 12871."[2]   On August 2, 2001 Customs sent the NTEU a copy of the RNIAP along with a cover letter announcing that Customs had decided "to exercise its statutory right to terminate and no longer be bound by the provisions in the national agreement in which we agreed to bargain over matters covered by 5 USC 7106 (b)(1)." JA 141.   Section 4 of the RNIAP expressly provides that it "supersedes and replaces [the 1995 NIAP] as well as all local agreements that address matters contained within [the RNIAP]." JA 144.   Section 3 more broadly states that the RNIAP's "policies and procedures . . . take precedence over any and all other agreements, policies, or other documents or practices executed or applied by the parties previously, *at either the national or local levels*, concerning the matters covered within this Handbook."   JA 144 (emphasis added).   Section 3 also states that "[n]o further obligation to consult, confer, or negotiate, either upon the substance or impact and implementation of any decision or action, shall arise upon the exercise of any provision, procedure, right or responsibility addressed or contained within this Handbook."   *Id*.   Section 5 then directs that "agency managers," in accordance with "workload," "operational needs" and/or "budgetary limitations," are to make decisions regarding such "Scheduling" and "Staffing Levels" matters as "Length of Workweek," "Work Hours," "Days Off," "Scheduling," "Staffing Levels," "Staffing Flexibility" and "Shift Swaps."   JA 145-46.   Customs' cover letter states the RNIAP is to take effect on September 30, 2001.

On October 3, 2001 the El Paso Port Director notified Chapter 143 of a change in personnel rotation and RDOs.  Up to that time, each Customs passenger inspector in El Paso was

---

[2]The order expressly stated: "Nothing in this order shall abrogate any collective bargaining agreements in effect on the date of this order."  66 Fed. Reg. at 11,227.

rotated among three bridges there—serving for two weeks at each bridge, then starting the sequence over—and received a four-day weekend every three weeks. Under the new policy, each passenger inspector was to be assigned to a single bridge for a one-year term and to receive a four-day weekend only every five to six weeks. On October 4, 2001 the NTEU filed a request to bargain over the change pursuant to the NLA, which Customs denied. On October 7, 2001 Customs implemented the RNIAP.[3] The NTEU filed a grievance alleging an unfair labor practice in violation of 5 U.S.C. § 7116(a)(1) and (5). When Customs failed to respond, the NTEU invoked arbitration.

The arbitrator issued an award in favor of Customs, rejecting the NTEU's contentions that the RNIAP violates Articles 20 and 37 of the NLA because, the arbitrator concluded, these provisions were "trumped" by the FLRA's decision in *United States Department of the Treasury Customs Service*, 59 F.L.R.A. 703 (2004), *review denied*, *NTEU v. FLRA*, 414 F.3d 50, 57 (D.C. Cir. 2005), in which the FLRA upheld Customs' implementation of the RNIAP. The arbitrator further found that the RNIAP, unlike its predecessor NIAP, " 'did not contain provisions authorizing local bargaining' " and observed that "he was 'bound to the [Authority's] conclusions' as well as case law holding that the obligation to bargain attaches at the level of exclusive recognition." FLRA Dec. at 5 (quoting arbitration award at 15, 16). Accordingly, the arbitrator concluded that " '[w]ithout an obligation to bargain at the local level . . . there can be no violation of the Statute . . . for a failure or refusal to bargain.' " *Id.* (quoting arbitration award at 16).

The NTEU excepted to the arbitral award and the FLRA denied its exceptions in a decision issued May 16, 2005. In

---

[3]In implementing the new local bridge rotation scheme and the RNIAP, Customs apparently intended no change to its existing "bid and rotation process" for particular job positions. *See infra* note 5.

upholding the award, the Authority relied principally on its decisions in *Customs Service* and in *NTEU Chapter 137*, 60 F.L.R.A. 483 (2004), *recons. denied*, 61 F.L.R.A. 60 (2005). In *Chapter 137*, the Authority determined that Customs had no obligation to bargain at the local level over a change in local Sunday overtime assignments because RNIAP "section 3 terminated locally negotiated agreements concerning inspectional assignment matters, as well as the Agency's obligation to bargain at the local level regarding such matters." 60 F.L.R.A. at 487.eu v.

Nonetheless, the Authority further concluded in *Chapter 137* that the fact that section 3 "unilaterally, but lawfully, implemented RNIAP did not extinguish Customs' statutory bargaining obligations at the national level (that is, at the level of exclusive recognition) to bargain over all mandatory subjects of bargaining concerning overtime inspectional assignments." 60 F.L.R.A. at 488. The Authority applied the same reasoning here to local bargaining over bridge assignment rotation and RDOs:

> Section 3 of the RNIAP by its terms effectively terminated any previously existing agreement that required the Agency to bargain at the local level over the impact and implementation of decisions concerning the assignment of inspectors. "[S]ection 3 established the RNIAP as the governing policies and procedures with respect to inspectional assignment matters," including, as provided in Article 5 of the RNIAP, the length of the work week, tours of duty, and days off. *NTEU Chapter 137*, 60 F.L.R.A. at 487. Therefore, for reasons previously expressed in *NTEU*, Chapter 137, the Agency did not have any obligation to bargain at the local level over the impact and implementation of the changes concerning bridge assignments and RDOs.

FLRA Dec. at 15-16. The NTEU filed a timely petition for review of the FLRA's decision.[4]

## II.

"[W]hen acting 'within its authority' and 'consistent with the congressional mandate,' the Authority's decision may only be set aside if it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *NTEU v. FLRA*, 414 F.3d at 57 (quoting *Ass'n of Civilian Technicians v. FLRA*, 250 F.3d 778, 782 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(A); *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 & n.7, 98 n.8 1983))) (alteration in *NTEU*). Applying this deferential standard, we uphold the Authority's decision. The NTEU acknowledges that the requirement in NLA Article 37, section 6.B that Customs bargain locally over changes in rotation and RDOs "concerns a permissive subject of bargaining" and "[t]herefore, it became subject to revocation by either party upon the expiration of the national agreement in 1999." Opening Br. 16 (citing *Fed. Aviation Admin.*, 14 F.L.R.A. 644 (1984)). The only issue therefore is whether the FLRA reasonably determined that the RNIAP effectively revoked section 6.B. We conclude the Authority's determination was reasonable given the expansive language of RNIAP section 3 preempting all previous agreements and disclaiming all further bargaining obligations on the matters covered in the RNIAP.

---

[4]The NTEU also filed petitions for review of *Chapter 137* and of *United States Customs and Border Patrol Port of Seattle*/NTEU *Chapter 139*, 60 F.L.R.A. No. 97 (Dec. 17, 2004), *recons. denied*, 61 F.L.R.A. No. 16 (July 8, 2005), in which the Authority rejected unfair labor practice charges based on Customs' unilateral change of local overtime policies. *See NTEU v. FLRA*, No. 05-1338 (pet. filed Aug. 24, 2005); *NTEU v. FLRA*, No. 05-1352 (pet. filed Sept. 2, 2005). Those petitions have been held in abeyance pending the decision here.

Nonetheless, the NTEU raises two arguments against revocation. We address, and reject, each one in turn.

First, the NTEU argues that the FLRA failed to follow its precedent requiring that an agency give explicit notice of intent to terminate a bargaining provision. *See U.S. Dep't of Justice*, 55 F.L.R.A. 201, 205 (1999) ("Authority precedent suggests that to be effective, a party must give notice that explicitly contains a statement of intent to terminate a provision dealing with a permissive bargaining subject."). The NTEU contends the RNIAP falls short of this requirement because it does not specifically identify article 37, section 6.B as being revoked or disclaim a bargaining obligation on the *local* level. As to the former, we find no requirement in FLRA precedent that the employing agency cite the specific provision revoked. Quite the contrary, in *Federal Aviation Administration*, 23 F.L.R.A. 209 (1986), the Authority concluded that the union effectively revoked a waiver of its right to negotiate, set out in an expired agreement, when its president informed the Federal Aviation Administration that " '*any prior bargaining authority* given to any [union] representative other than [himself was] . . . revoked with respect to the national unit,' " 23 F.L.R.A. at 210 (emphasis and first alteration added). Similarly, in this case, the Authority's finding of valid revocation relies on the express language of RNIAP section 3, which declares that the RNIAP is to "take precedence over *any and all other agreements, policies, or other documents or practices* executed or applied by the parties previously . . . concerning the matters covered" and that Customs is to be subject to "*[n]o further obligation* to consult, confer, or negotiate." JA 144 (emphasis added). Relying on *Chapter 137*'s construction of this broad language, the FLRA reasonably found that "Section 3 of the RNIAP by its terms effectively terminated any previously existing agreement that required the Agency to bargain at the local level over the impact and implementation of decisions concerning the assignment of inspectors," FLRA Dec. at 15, notwithstanding *Chapter 137* also

concluded Customs could not lawfully refuse to bargain at the national level ("the level of exclusive recognition") over the impact and implementation of such decisions. In fact, NTEU acknowledges that "the purpose of [the second paragraph of section 3] is to foreclose *all* bargaining over any future management actions take pursuant to RNIAP" so that Customs "would have no duty to bargain—whether at the local or the national level—over the impact and implementation of management actions taken pursuant to RNIAP." Opening Br. 19-20. It argues, however, that the FLRA's subsequent determination in *Chapter 137* that Customs cannot avoid its statutory obligation to bargain over impact and implementation at the national level somehow voided its intent, conveyed to NTEU through section 3 of the RNIAP, not to bargain at the local level. The Authority reasonably concluded otherwise in both *Chapter 137* and its decision here.

The NTEU's fallback position is that, even if section 3 gave effective notice of Customs' intent to revoke its agreement to bargain over matters "covered," "addressed" or "contained" in the RNIAP, JA 144, because the term "rotation" is not specifically mentioned therein, the obligation to negotiate locally over rotation survives. We reject this argument as well. The NLA defines "rotation" as "[t]he recurring assignment of employees to different work locations, assigned work, shifts, and/or tours of duty within the confines of the employees' post of duty and/or other locations to which the employees are regularly assigned." JA 226. Under this definition, the bridge rotation at issue, including RDOs, is reasonably encompassed within the subject matter that RNIAP section 5 expressly declares is to be determined by "agency managers" in accordance with "workload," "operational needs" and/or "budgetary limitations," namely, the "length of the workweek and tours of duty," "work hours in each day of the basic workweek," "days off," "scheduling the numbers, types and grades of employees . . . for any particular tour, shift, location,

special team or task," "the number of inspectional personnel assigned to any inspectional activity . . . on a regular workday or holiday" and "assign[ing] employees from one facility to another." JA 145-46. Nor does any of the arbitration hearing evidence cited by NTEU, which is at best ambiguous in its references to rotation, plainly contradict the FLRA's determination that Customs effectively revoked its agreement to negotiate rotation on the local level.[5]

Because the FLRA reasonably determined that Customs, through the RNIAP, effectively revoked its agreement in the

---

[5]The NTEU points to testimony of Customs official Dennis Reischl and an annotated version of the RNIAP, with accompanying "Frequently Asked Questions," which appear to refer to a pre-existing annual or semiannual "bid and rotation process" by which employees "bid to various positions—cargo, passenger processing, whatever," for which "a seniority system [had] been applied in the past against . . . preferences and bids," JA 118-19, and not to the regular rotation of employees in one position—here, passenger inspector—from one location to another. *See* JA 116 (Reischl testimony that RNIAP "did not control or affect the annual bid and rotation systems that were set up across country"); JA 120 ("NIAP FAQS" # 7 stating RNIAP "affects your current bid and rotation system only to the extent that the number, types or grades of employees who will be required to bid into a particular assignment may change" but "[o]therwise it does not address current systems"); JA 133 ("Relative to local bid systems, the assignment procedures remain in effect until such time as they may be changed through national negotiations. . . . How the bid process is administered (e.g. seniority, duration, etc.) is the portion that remains unchanged at this time and will be addressed nationally at a later point in time."). In any event, whatever the cited evidence might suggest regarding Customs' intent, it does not lessen the notice effect of the RNIAP itself on the NTEU which was not privy to the annotated RNIAP or to Reishchl's opinion.

NLA to bargain over rotation and RDOs at the local level, the petition for review is denied.

*So ordered*.